# In the United States Court of Federal Claims

No. 14-33L
(Filed: November 8, 2017)

|  |  |  |
|---|---|---|
| BOYER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Rails-to-Trails; Fifth Amendment |
| v. | ) | Takings; Oregon Law; Scope of |
| | ) | Easement |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Mark F. ("Thor") Hearne, II*, Clayton, MO, with whom were *Meghan S. Largent*, *Lindsay S.C. Brinton*, *Stephen S. Davis*, Clayton, MO., *Debra J. Albin-Riley*, Los Angeles, CA, for plaintiff.

*Rachel K. Roberts*, Environment and Natural Resources Division, United States Department of Justice, Seattle, WA, with whom was *John C. Cruden*, Assistant Attorney General, Washington, DC, for defendant. *Evelyn Kitay*, Deputy General Counsel, Surface Transportation Board, Washington, DC, of counsel.

## O P I N I O N

**FIRESTONE**, *Senior Judge*

In the court's initial decision in this case, the court held that the conversion of a railroad right-of-way to a recreational trail in Benton County, Oregon gave rise to a taking of property rights under the Fifth Amendment for these plaintiffs. *Boyer v. United States*, 123 Fed. Cl. 430 (2015). Now before the court are the parties' cross motions for partial summary judgment on the question of whether plaintiffs who had crossing rights over the right-of-way when it was used for railroad purposes are entitled to severance

damages based on the plaintiffs' legal contention that crossing rights are not legally guaranteed following issuance of the Notice of Interim Trail Use ("NITU") by the Surface Transportation Board ("STB").  In brief, the plaintiffs[1] argue that they are entitled to severance damages because the landowners do not have the same legally enforceable rights to cross the right-of-way encumbered by the Benton County trail, as they had when the railroad held the right-of-way easement.  The government argues that the actions of the STB did not preempt plaintiffs' crossing rights and that any uncertainty regarding interference with crossing rights by virtue of the STB's action authorizing conversion to a trail is too speculative to allow for just compensation.

For the reasons stated below, the court **DENIES** the parties' cross motions for summary judgment on the grounds that the issue involves potentially disputed issues of fact, which require further development.

I.   **Factual Background**

A.  **Issuance of the NITU**

As previously discussed in *Boyer*, this lawsuit involves two rail segments constructed in Benton County, Oregon: the Bailey Branch railroad corridor from milepost 682.25, near Greenberry, Oregon to milepost 671.58, near Monroe, Oregon; and the Hull Oakes Lead railroad corridor from milepost 673.21, near Alpine Junction, Oregon to milepost 680.06, near Dawson, Oregon.  *Boyer,* 123 Fed. Cl. at 434.  Together, these

---

[1] Although the plaintiffs' motion refers to thirteen landowners, the parties' representatives have reached settlement as to the claims of Chintimini Land Co., so this motion now addresses the claims with respect to only twelve landowners.

2

sections comprise a total of 17.86 miles.  *Id.*  "In the early 1900s, the Corvallis and Alsea River Railway Company, and later its successor—the Portland, Eugene, and Eastern Railway Company—obtained the property interests in land" at issue "to construct the Bailey Branch and Hull Oakes Lead rail corridors in Benton County, Oregon."  *Id.* at 433.  The Corvallis and Alsea River Railway Company constructed the initial portion of the Bailey Brach railroad corridor, from Corvallis to Alpine Junction, and the Hull Oakes railroad corridor in 1909 and 1910.  *Id.* at 434.  The Corvallis and Alsea River Railway Company's successor, the Portland, Eugene, and Eastern Railway Company, constructed the remaining portion of the Bailey Branch railroad line in 1913.  *Id.*  Together, these portions represent the rail line at issue here.  *Id.*

Southern Pacific Transportation Company ("Southern Pacific") and later Union Pacific Railroad Company ("Union Pacific") eventually purchased the line.  *Id.*  "In 1993, the line was leased to Willamette and Pacific Railroad ("WPRR"), which operated the line."  *Id.*  Union Pacific and WPRR sought an exemption from the STB under 49 U.S.C. § 10502 and 49 C.F.R. § 1152.50 for the line.  *Id.*  "In response to Union Pacific's petition, Benton County, Oregon requested that the STB issue a NITU declaring that the railroad corridor was suitable for railbanking.  *Id.*  "Union Pacific then filed a statement indicating its willingness to negotiate with Benton County for a trail use/railbanking condition."  *Id.*  The STB issued the NITU under the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("section 1247(d)" or "section (d)"), on September 9, 2011.  *Id.*  "On March 4, 2014, Union Pacific and Benton County filed a notice that they had reached an agreement."  *Id.*

**B.  Terms of the Purchase and Sale Agreement**

The "Purchase and Sale Agreement" between Union Pacific and Benton County, Oregon ("Purchase and Sale Agreement" or "Purchase Agreement") contains several provisions relevant to the issues in this case.  ECF No 123-11 (Ex. K).  Under the Purchase and Sale Agreement, Benton County received a Quitclaim Deed.  *Id.* at 6. Section 1(c) of the Purchase and Sale Agreement states that "[t]he sale made pursuant to this Agreement shall be subject to any and all applicable federal, state and local laws, orders, rules and regulations, and any and all outstanding rights of record, open and obvious on the ground."  *Id.* at 2.

Section 6(b) ("Unidentified Licenses") of the Purchase Agreement provides:

> Buyer [Benton County, Oregon] acknowledges that the Property may be subject to licenses and other third party rights (collectively, "Unidentified Licenses") that have not been identified by Seller [Union Pacific] to Buyer after Seller's search of its real estate records. It is the responsibility of Buyer to determine if any of these Unidentified Licenses exist. If any Unidentified License that affects the Property is identified after the Execution Date by either Buyer or Seller, Seller's rights (including, without limitation, any income) and obligations under such Unidentified License will be assigned to and assumed by Buyer at Closing to the extent such Unidentified License affects the Property, or anytime after Closing if such Unidentified License is discovered by Buyer after Closing. Such assignment and assumption shall be by duly executed Assignment and Assumption Agreement in the form attached hereto as **Exhibit C.**

*Id.* at 7.

Section 7 ("Assignment of Identified Licenses") of the Purchase Agreement proclaims that:

> Upon Closing, Seller [(Union Pacific)] shall assign to Buyer [(Benton County)] and Buyer shall assume all of Seller's right title and interest in and to the license and other agreements (the "Identified Licenses") listed on

> **Exhibit B to Exhibit C** attached hereto and hereby made part hereof but only to the extent the Identified Licenses affect the Property. Such assignment and assumption shall be by duly executed Assignment and Assumption Agreement in the form attached hereto as **Exhibit C** and hereby made a part hereof.  Rentals and other payments under the Identified Licenses shall be prorated between Seller and Buyer as of the date of Closing.

*Id.* at 8.  The "Identified Licenses" includes Horning Enterprises' license to install a six-inch drainage pipe. *Id.* at 19.  However, it does not include Frances Oakes' license, nor does it include Walter Van Smith's license.  *Id.*

## C. Subcategories of Plaintiffs

The twelve plaintiffs' claims can be broken into three subcategories, depending on the nature of their pre-existing crossing rights: (1) those plaintiffs with crossing rights reserved in original source deeds, (2) those plaintiffs with crossings in written licenses, and (3) those plaintiffs with unrecorded crossings (potential prescriptive easements). This court shall address each subcategory separately.  However, as noted below, several plaintiffs not only possess multiple crossings, but multiple types of crossings.

### 1.  Plaintiffs with Original Source Deeds

Ten of the plaintiffs have original source deeds in which the railroad "covenanted to construct crossings" at locations to be decided by the grantor (i.e. the plaintiff or the plaintiff's predecessor).  United States' Cross-Mot. For Partial Summ. J. and Resp. in Opp. To Pls.' Mot. For Partial Summ. J. ("Def.'s Mot.") at 24, ECF No. 132.  These plaintiffs are the following: David Virgil Baker, Susan Benninghoven, Florence Fulgham, Goracke Bros., Sarah Green and Christen Killsgaard Living Trust ("Green/Killsgaard Trust"), David Horning and Daniel Ogle Living Trust ("Horning/Ogle Trust"), Donald

and Donna Oakes Living Trust ("Oakes Trust"), Virginia Schrock, William and Kathleen

Sutton, and Walter Van Smith.

Although the deeds of these individuals are not identical, they are very similar.

For example, Mr. Baker's deed states that:

> [t]he said grantee [(Corvallis & Alsea River Railway Company)] for itself
> and its successors and assigns hereby covenants and agrees with said
> grantors[,] their heirs and assigns and this conveyance is upon the express
> condition, that before operating trains across said premises above
> described[,] it [the grantee] will fence said right-of-way with American
> Field woven wire fence known as the 'seven thirty nine' fence with one
> barbed wire on top and thereafter maintain said fence and that it will
> construct and thereafter maintain at such points as the grantors, or their
> heirs or assigns, may designate two open crossings with gates over said
> right-of-way sixteen feet wide and fully equipped with cattle-guards so
> constructed that the same will effectively prevents stock from passing up
> and down the track on the strip of land hereby granted."

CB Starr deed, ECF No. 39-8 (Ex. V). The deed additionally provides that:

> If the grantee shall on reasonable demand of the grantors or their heirs or
> assigns failed to comply with any of the covenants or conditions herein
> contained[,] the title to said premises hereby conveyed shall revert to and
> revest in the grantors, their heirs or assigns as fullyand [sic] completely as
> though this conveyance had never been made. The foregoing covenants
> shall be construed as covenants running with the title to the land aforesaid.

*Id.*

Furthermore, all of the aforementioned plaintiffs who have original source deeds,

except Virginia Schrock, have stipulated that they have not been prevented from crossing

the right-of-way at the locations indicated in the relevant maps attached to the factual

stipulations since the STB issued the NITU on September 9, 2011.  ECF No. 123 ¶ 1.

Ms. Schrock has not provided any evidence that she has been prevented from crossing the

6

right-of-way since the STB issued the NITU on September 9, 2011.  *See* Def.'s Mot. at 13.

### 2. Plaintiffs with Written Licenses

Three plaintiffs have written licenses with the railroad or the railroad's predecessors.  Def's Mot. at 23; Landowners' Mem. in Supp. of Their Mot. for Summ. J. on the Measure of Just Compensation the Gov't Owes the Owners of Thirteen Props. ("Pls.' Mem.") at 7–10, ECF No. 128-1.  These plaintiffs are Horning Enterprises, Frances Oakes, and Walter Van Smith.  They have all stipulated that they have not been prevented from crossing the right-of-way at the locations identified in the relevant maps attached to the factual stipulations since the STB issued the NITU on September 9, 2011. ECF No. 123 ¶ 4, 5, 7.

Horning Enterprises has a license allowing it to cross the right-of-way with a six-inch drainage pipe, which Southern Pacific, Union Pacific's predecessor, granted Horning Enterprises' predecessor-in-interest, George Horning, in 1978.  ECF No. 123 ¶ 5; ECF No. 123-10 (Ex. J) at 3. The license is revocable/terminable by either party upon thirty days' prior notice.  ECF No. 123-10 (Ex. J) at 4.  As part of the Purchase and Sale Agreement, Union Pacific assigned Horning Enterprises' license to Benton County and Benton County assumed the license.  ECF No. 123 ¶ 6.

Frances Oaks has a license "to construct, maintain and use a private roadway" across the right-of-way which was granted to her late husband, Roger Oaks, in 1974.[2]

---

[2] Note that although the factual stipulations state that the agreement was entered into in 1973, the agreement itself is dated 1974.  ECF No. 123 ¶ 4; ECF No. 123-9 (Ex. I) at 2.

ECF No. 123 ¶ 4; ECF No. 123-9 (Ex. I) at 1, 2.  The license is revocable/terminable by either party upon thirty days' notice.  ECF No. 123-9 (Ex. I) at 3, ¶ 9.  Ms. Oakes' license was not listed in the list of "Identified Licenses" in the Purchase and Sale Agreement. ECF No. 123-11 (Ex. K) at 19.   According to the plaintiffs, "Southern Pacific did not assign this license to Union Pacific and the license was not part of Union Pacific's assignment to Benton County. Benton County has not recognized this license."  Pls.' Mem. at 9; ECF No. 123-11 (Ex. K) at 7, 14, 19.

Walter Van Smith has a license "to construct, maintain and use a private roadway" across the right-of-way, effective July 18, 2000.  ECF No. 123 ¶ 7; ECF No. 123-12 (Ex. L) at 1–2.  The license is revocable/terminable by either party upon thirty days' notice. ECF No. 123-12 (Ex. L) at 3, ¶ 8.  Mr. Van Smith's license was not included in the list of "Identified Licenses" in the Purchase and Sale Agreement.  ECF 123 ¶ 7; ECF 123-11 (Ex. K) at 19.  According to the plaintiffs, "Willamette & Pacific Railroad did not assign this license to Union Pacific, and Union Pacific did not assign this license to Benton County.  Benton County has not recognized this license."  Pls.' Mem. at 10; ECF No. 123-11 (Ex. K) at 7, 14, 19.

### 3.  Plaintiffs with Unrecorded Crossings

Four plaintiffs have unrecorded crossings (i.e. crossings without crossing rights in a source deed, license, or otherwise recorded) and thus have potential prescriptive easements, according to the government.  Def.'s Mot. at 27–28.  These plaintiffs are Florence Fulgham, Goracke Bros., Horning Enterprises, and Oakes Trust.  These plaintiffs have stipulated that they have not been prevented from crossing the right-of-

8

way at the locations indicated in the relevant maps attached to the factual stipulations since STB issued the NITU on September 9, 2011. ECF No. 123 ¶ 1.

Briefly, Ms. Fulgham has three unrecorded crossings from Alpine Road across the right-of-way into the northwestern quadrant of her property, which she has used since January 3, 1973.  ECF No. 123 ¶ 1; ECF No. 123-3 (Ex. C) at 2–3, 5; Def.'s Mot. at 7, 28–29.  The Goracke Bros. has one unrecorded crossing, which it has used since January 11, 1990.  ECF No. 123 ¶ 1; ECF No. 123-4 (Ex. D) at 2.  *See also* Def.'s Mot. at 7–8, 28–29. Horning Enterprises has two unrecorded crossings, which it has used since December 29, 1988.  ECF No. 123-10 (Ex. J) at 2.  *See also* Def's Mot. at 28–29. Finally, the Oakes Trust has one unrecorded crossing, which it has used since October 18, 1996.  ECF No. 123 ¶ 1; ECF No. 123-7 (Ex. G).  *See also* Def.'s Mot. at 28–29.

## II. Procedural History

On June 12, 2017, the plaintiffs filed a motion for partial summary judgment on the issue of the measure of just compensation the government owes the owners of the subject properties.  ECF No. 128-1.  The government subsequently filed its cross motion and response on August 4, 2017.  ECF No. 132.  The plaintiffs filed their reply and response on September 7, 2017.  ECF No. 136.  The government filed its reply and response on September 29, 2017.  ECF No. 142.  Oral argument was heard on October 26, 2017.

## III. Summary Judgment Standards

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law."  Rules

of the United States Court of Federal Claims, Rule 56(a).  A genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor, and a material fact is one that could affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 331 (1986).  In evaluating motions for summary judgment, courts must draw any inferences from the underlying facts in the light most favorable to the non-moving party, and courts may not weigh the evidence or engage in credibility determinations.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary judgment may be granted.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  With respect to cross motions for summary judgment, courts must evaluate each motion on its own merits and resolve reasonable inferences against the party whose motion the court is considering.  *Marriot Intern. Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir.2009).

## IV. Discussion

As noted at the outset, this court has already held that the government is liable to these plaintiffs for a taking following the issuance of the NITU.  *Boyer* 123 Fed. Cl. 430.  The issue now before the court concerns the proper measure of just compensation.  The parties agree that the "before-and-after method" represents the appropriate measure of

just compensation in this case, and that the "before" condition is the "plaintiff's unencumbered enjoyment of its property."  Pls.' Mem. at 14, 19–21; Def.'s Mot. at 30. *See also Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012) ("Where the property interest permanently taken is an easement, the 'conventional' method of valuation is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed.'") (quoting *United States v. Va. Elec. & Power Co.,* 365 U.S. 624, 632 (1961)); *Ellamae Phillips Co. v. United States*, 119 Fed. Cl. 268, 273 (2014) ("the calculation of damages assumes a piece of property completely unencumbered by the prior railroad easement.").

The dispute between the parties arises over how the property should be valued in the "after" condition.  Since the parties could not agree with each other, they instructed their joint appraiser, Jim Lyon, to value the right-of-way in the "after" condition both with and without the ability to cross the right-of-way.  ECF No. 128-15 at 2 (appraisal instructions) ("United States and Plaintiffs' counsel . . . request that you appraise the 'after' condition of Plaintiffs' parcels under two alternative assumptions. Under the first assumption, you should assume that Plaintiffs are able to cross the right-of-way in the 'after' condition as they are now. Under the second assumption, you should assume that Plaintiffs are not able to cross the right-of-way at all in the 'after' condition.").  *See also* Def.'s Mot. at 4, United States' Reply in Supp. of Its Cross-Mot. for Partial Summ. J. and Resp. in Opp'n to Pls.' Mot. for Partial Summ. J. ("Def.'s Resp.") at 2–3, ECF No. 142; Pls.' Mem. at 6–7, 35.  The difference in value between the two instructions is $2,849,800.  Pls' Mem. at 35.

The plaintiffs based their appraisal instruction on their initial argument in this case that the "STB's invocation of section 8(d) [of the Trails Act] perpetually preempted these owners' state-law reversionary right to use and possess their land and the STB's plenary and exclusive jurisdiction over this rail-trail corridor preempted any remedy the owners could assert under Oregon state law to obtain a right to use and possess the land under the corridor." Pls.' Mem. at 11–12.  It is clear from the oral argument that the plaintiffs are no longer making this argument.  Rather, they now apparently concede that the Trails Act did not preempt their state law rights.[3]  However, they still maintain that whereas they had guaranteed access to their properties at specific locations before the NITU was issued, when the NITU was issued, their crossing rights at those specific locations became uncertain.  Specifically, they argue that their prior crossing rights might not be the same as those identified in the deeds and thus the trail operator could ask them to change their crossing locations.  They argue with regard to crossing rights claimed under

---

[3] This court agrees that the Trails Act did not preempt plaintiffs' pre-existing rights of access over the right-of-way.  *See Dana R. Hodges Trust v. United States,* 111 Fed. Cl. 452, 456–57 (2013) (holding that "other than asserting state law claims of abandonment, [p]laintiffs are no-wise impeded from exercising whatever rights of access they held that pre-existed the conversion of the railroad corridor to recreational usage."); *Sears v. United States*, 132 Fed. Cl. 6, 26 (2017), *amended on reconsideration* (Fed. Cl. May 10, 2017), *notice of appeal docketed*, No. 2017-2172 (Fed. Cir. June 16, 2017) (holding that "[w]ith specific regard to access rights over a former railroad right-of-way under state law, both this court and the STB have held that such rights are not preempted by the Trails Act and thus state law continues to apply to those rights.") (citing *Hodges,* 111 Fed. Cl. at 457; *Jie Ao and Zin Zhou – Petition for Declaratory Order*, Docket No. FD 35539, 2012 WL 2047726 (STB June 6, 2012)); *James v. United States*, 130 Fed. Cl. 707, 733–34 (2017) (holding that "[p]laintiffs crossing rights have not changed. Instead, plaintiffs hold the same crossing rights over the trail use and railbanking easements imposed by the NITU and retain the same entry rights that plaintiffs held when [the railroad] received the easements for railroad purposes over plaintiffs' land.").  *See also Balagna v. United States*, No. 14-21L/16-405L, 2017 WL 4416820 (Fed. Cl. Oct. 5, 2017).

a license, that the license could be revoked.  With regard to crossing rights secured through a prescriptive easement, they argue that the easement may not bind the trail operator and that crossing rights would have to be secured through litigation.

Plaintiffs claim that the legal uncertainty associated with their crossing rights has reduced the value of the remainder of their property, and thus they are they are entitled to severance damages.  Severance damages compensate for the diminution in value in the owner's remaining property resulting from the taking.  *See McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 614 (2013) (citing *United States v. Miller,* 317 U.S. 369, 376 (1943) ("If only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire track."); *United States v. Grizzard,* 219 U.S. 180, 185 (1911) ("When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account.").  At oral argument, the plaintiffs suggested that the court order a new appraisal with an instruction for the appraiser to the effect that the properties should be valued in the after condition based on the assumption that the plaintiffs no longer have guaranteed crossing rights or that their crossing rights are now legally "uncertain."

The government argues that because the STB's invocation of section 8(d) of the Trails Act does not preempt or eliminate any of the plaintiffs' pre-existing crossing rights, the government has not taken or impaired the plaintiffs' crossing rights, and thus the plaintiffs are not entitled to any compensation for loss of access.  Def.'s Mot. at 14– 20, 30–31; Def.'s Resp. at 7–9.  According to the government, the plaintiffs' claim that

their crossing rights are in potential jeopardy with the new trail operator is too speculative and hypothetical to warrant valuation. Def.'s Mot at 32–35; Def.'s Resp. at 1–6. *See Fordyce v. United States*, 7 Cl. Ct. 591, 600 (1985) ("Just compensation may not be predicated on potential uses [of the subject property] which are speculative or conjectural.") (citation omitted). The government relies on the undisputed fact that none of the plaintiffs have been denied access since Benton County has signed the trail use agreement. Def.'s Mot. at 33–34.

For the reasons that follow, the court finds that whether any real or potential interference with crossing rights would affect property values involves questions of fact and expert opinion, which preclude the court from granting summary judgment to either party or endorsing any specific appraisal instruction.

The plaintiffs rely on *Moore v. United States* to argue that as a matter of law the question of what a willing buyer would pay a willing seller for property divided by a right-of-way after the issuance of a NITU necessarily involves an evaluation of the weight a buyer would place on having the pre-existing crossing location or locations challenged or changed by the trail operator. In *Moore*, in a situation analogous to the pending case, the court noted that whether a trail operator would challenge or change a crossing right could have an impact on valuation and could possibly diminish the value of

the remainder if comparable sales or other evidence could establish this fact.[4]  *Moore v. United States*, 61 Fed. Cl. 73, 78–79, 82 (2004).

The government for its part, also relies on *Moore*.  The government argues that the plaintiffs here, as in *Moore*, "have failed to provide evidence on the effect of any *potential* (but as of yet nonexistent) loss of crossing rights, and such rights could not be entirely cut off under state law."  Def.'s Resp. at 4 (citing *Moore*, 61 Fed. Cl. at 79, 82).  The government further argues that "the only evidence on which [the] [p]laintiffs have relied is the joint appraiser's analysis, . . . but . . . [their] instruction only asked Mr. Lyon to appraise in the 'after' condition under the hypothetical condition that [the] [p]laintiffs would not be able to cross at all.  They did not ask him to determine how the possibility of going to state court to enforce their crossing rights should be valued."  *Id.* at 5 (citing ECF No. 128-15 at 2).  In *Moore,* the court examined the question of whether plaintiffs could be permanently cut off from access to their properties under Missouri law and found they could not.  *Moore*, 61 Fed. Cl. at 78–79.  Here, the government relies on Oregon law to argue that each category of plaintiffs has a legitimate legal claim for their crossing rights, and thus plaintiffs cannot seriously contend that their right to cross the trail easement to gain access to their remainder property could ever be cutoff.  Def.'s Mot. at 21–29; Def.'s Resp. at 9–15.

---

[4] In *Moore*, after trial, the court held that the plaintiffs in that case had not met their burden of proving any diminution in value to the remainder and thus denied plaintiffs' claim for severance damages.  *Moore v. United States*, 61 Fed. Cl. 73, 79, 82 (2004).

With regard to those plaintiffs with crossing rights reserved in their source deeds, the government relies on *Beck v. Lane County* to argue that these plaintiffs have a guaranteed right of access.  Def.'s Mot. at 21–22; Def.'s Resp. at 11–13.  In *Beck*, the property owners appealed the dismissal of their action to recover damages arising from the county's destruction of their roadway under the railroad during the construction of a public highway.  *Beck v. Lane County*, 141 Or. 580 (1930).  The Oregon Supreme Court found that:

> the owner of the Beck land by a stipulation or reservation in his right of way deed to the railroad company created an easement across the railroad for the benefit of his remaining land. The railroad right of way thereby conveyed passed to the [successor] railroad company incumbered [sic] by the easement, so covenanted or reserved, and the right and burden thus created passed to and was binding upon all subsequent grantees of the respective properties, including the county of Lane. Those covenants which are held to run with the land, and to inure to the benefit of the assignee, are such as generally affect the land itself, and confer a benefit on the grantor. Covenants running with the land are very frequently embodied in railroad contracts.

*Beck*, 141 Or. at 592–93 (citations omitted). The government asserts that *Beck*'s "central holding . . . is that a covenant requiring the railroad to construct and maintain crossings creates an enforceable covenant running with the land in favor of the grantor, at the location the grantor crossed the right-of-way, and against all 'subsequent grantees' of the railroad, including a county that purchases that right-of-way."  Def.'s Resp. at 12 (citing *Beck*, 141 Or. at 592).  The plaintiffs challenge the government's broad reading of *Beck* to suggest that all of their rights of way have been preserved by their source deed. Landowners' Reply in Supp. of Their Mot. for Summ. J. on the Measure of Just Compensation the Gov't Owes the Owners of Thirteen Prop., and Resp. in Opp'n to

16

United States' Cross-Mot. for Partial Summ. J. ("Pls.' Resp.") at 11–16, ECF No. 136.

The plaintiffs argue that while their deeds may have reserved certain crossing rights, it is

not clear that those crossing rights comport with the deeds and thus that the trail operator

could require changes to comport with the specific limitations established in the deeds.

Although the plaintiffs have not presented any facts to support this claim, they contend if

their crossing rights are not the same as those reserved that their properties would be less

valuable.

For those plaintiffs with licenses, the government argues that they are not entitled

to severance damages because the licenses are likely to be considered "irrevocable" under

Oregon law and thus would be enforced.  Def.'s Mot. at 23–24; Def.'s Resp. at 10.  As

the government explains, "Oregon is one of a minority of jurisdictions which recognize

the possibility of an irrevocable license." Def.'s Mot. at 23 quoting *Brown v. Eoff*, 271

Or. 7, 10–11 (1975).  "An irrevocable license arises when the landowner's promise to

allow a use of the land for an unlimited time induces the other party to make significant

expenditures for permanent improvements, consistent with the use for which the consent

was given."  *Dority v. Hiller*, 162 Or. App. 353, 357 (1999) (citing *Brown*, 271 Or. at 11).

"If the licensee proves by clear and convincing evidence that the consent was given and

that the licensee reasonably and detrimentally relied on the consent, then the landowner is

estopped from revoking the license." *Id.*  The Oregon Court of Appeals in *Dority* held

that the defendants had established an irrevocable license in a pipeline running under the

plaintiffs' property when the defendants had installed the pipeline after the plaintiffs had

granted them permission to do so.  *Id.* at 356.

The government asserts that "[t]he evidence obtained in discovery shows that both the Horning Enterprises and Van Smith licenses likely became irrevocable after the plaintiff or its successor constructed improvements based on the licenses." Def.'s Mot. at 24. With respect to Horning Enterprises, the government argues that "[t]he letter from the railroad returning a signed copy of its license to George Horning, the predecessor of Horning Enterprises, refers to 'an agreement relating to *proposed* installation of a six-inch steel PVC drainage pipeline,' . . . thereby implying that the pipeline was later installed in reliance on this license." *Id.* (citing ECF No. 123-10 at 7). Additionally, for the Van Smith property the government relies on Mr. Van Smith's daughter's response to the United States' interrogatory where she stated "that her father obtained his agreement with the county for the purpose of obtaining a permit from the county to build his home" to argue that Mr. Van Smith's "license became irrevocable after he built his home." *Id.* (citing ECF No. 132-8 ("Kelli Smith's Response to Interrogatory No. 1 answering on behalf of her father, Walter Van Smith: Benton County required Mr. Smith to get permission from the railroad to cross the right-of-way in the late 1990s before he could build his home." (emphasis omitted)). The government further explains that "to the extent Mr. Lyon's appraisals are before the Court, Mr. Lyon stated in his appraisals of the Horning Enterprises and Frances Oakes properties that 'it is not reasonably probable to assume that this [access] permit would be terminated as of the date of value.'" Def.'s Resp. at 11 (citing ECF No. 128-8 at 3; ECF No. 128-11 at 3).

Again, the plaintiffs argue, in response to the government's contentions, that regardless of whether the government's reading of the law is correct, the plaintiffs'

crossing rights under their respective licenses have not been litigated, and thus their rights are still uncertain.  Pls.' Resp. at 9–11.  They argue that whether the potential for litigation over the licenses would reduce their property values is an issue they should be able to establish.

Finally, the government contends with regard to the plaintiffs whose crossing rights were not reserved in their deeds or with a license, that these plaintiffs are also able to claim a continued right to cross over the right-of-way based on state laws which recognize the need for easements where access would otherwise be cut off.  Def.'s Mot. at 26–29; Def.'s Resp. at 13–15.  The government explains that "[a]s a general matter, a private party can obtain an easement by prescription over a railroad right-of-way."  Def.'s Mot. at 26 (citing *Wolf v. Cent. Or. & Pac. R.R.*, 230 Or. App. 269, 278 (2009) (citation omitted)).  According to the government, the Supreme Court of Oregon stated the elements required for establishing a prescriptive easement in *Thomason v. Scott.  Id.* "In order to establish an easement of way by prescription[,] the plaintiffs must establish an open and notorious use of [the] defendants' land adverse to the rights of [the] defendants for a continuous and uninterrupted period of ten years."  *Thompson v. Scott*, 270 Or. 542, 546 (1974) (finding that the evidence was insufficient to establish, by clear and convincing evidence, the adverse use necessary to establish a roadway easement by prescription across defendants' land).  *See also* Or. Rev. Stat. § 12.050 (ten-year period). "In order to satisfy the open and notorious requirement, the use of the easement must have been such that [the owner] had a reasonable opportunity to learn of its existence and nature."  *Foster Auto Parts Inc. v. City of Portland*, 171 Or.App. 278, 283 (2000) (citing

*Baylink v. Rees*, 159 Or.App. 310, 317 (1999)).  The government argues that the plaintiffs

"do not provide any facts rebutting the creation of a prescriptive easement, although they

vaguely suggest that they could be rebutted."  Def.'s Resp. at 13–14.  The government

also relies on *Sears* a recent Court of Federal Claims decision to explain that if state laws

provide crossing rights, severance damages are not allowed.  Def.'s Resp. at 5–6.  The

court in *Sears* found that "plaintiffs' state law right to access and cross the right-of-way is

not preempted by the Trails Act, and this right thus forecloses plaintiffs' claims for

access damages in this case."  *Sears v. United States*, 132 Fed. Cl. 6, 27 (2017).  The

government asserts that "[w]hile the Iowa statutory scheme that the court evaluated in

*Sears* is admittedly simpler than [p]laintiffs' crossing rights under Oregon law, a plaintiff

in *Sears* would still have to go to state court to enforce those rights, and the court in *Sears*

still found that those plaintiffs were not entitled to compensation for the possible need to

enforce their rights in state court."  Def.'s Resp. at 5–6 (citing *Sears*, 132 Fed. Cl. at 27;

Pls.' Resp. at 22).  The government contends that "[t]he reason for that determination was

the same as here: [p]laintiffs' crossing rights were not preempted by the NITU"  *Id.* at 6

(citing *Sears*, 132 Fed. Cl. at 27).

The plaintiffs argue that to the extent their crossing rights are based only on

prescriptive easements, their prior rights are especially vulnerable.  Pls.' Mem. at 35–38.

They emphasize that "[t]he ability to file a lawsuit to possibly obtain a right to use the

corridor land under state law theories of prescriptive easement, adverse possession or

easement by necessity is not an established legally-enforceable right that existed when

the government took these owners' property." Pls.' Mem. at 36. Plaintiffs contend that they could not represent to a future buyer that their crossing rights would be guaranteed.

The plaintiffs distinguish the present case from *Sears* where the court expressly determined that the state law guaranteed plaintiffs the same access they enjoyed while the railroad operated the right-of-way. Pls.' Resp. at 22 (citing *Sears*, 132 Fed. Cl. at 18). The plaintiffs argue that "Oregon has no similar statutory scheme upon which the landowners can securely rely and as such, *Sears* has little relevance to the issues before the court. *Id.*

The court has considered the parties' arguments, and while it appears that the legal risks to these plaintiffs with regard to their crossing rights, whether based on language in their deeds and licenses or held under state law, is negligible, the court agrees with the *Moore* court that the issue before the court is not about legal risk but is about valuation. Thus, as the *Moore* court explained, the issue for the court to ultimately decide is what a willing buyer would pay for the subject properties and whether such a buyer would be concerned about potential litigation over the right or location of access across the trail and whether this concern would then translate to a diminution in the value of the property. The plaintiffs' current appraisal does not address that question. The appraisal was based on the incorrect legal premise that plaintiffs lost all crossing rights to their properties upon issuance of the NITU. Thus, the government is correct that plaintiffs cannot rely on that appraisal to establish a right to severance damages and plaintiffs' original motion for summary judgment based on the legally unsupported appraisal instruction given by the plaintiffs must be **DENIED**.

However, the government's contention that the plaintiffs should not have the opportunity to show (through comparable sales or other valid appraisal evidence) that there is uncertainty associated with plaintiffs' crossing rights after issuance of the NITU or that such uncertainty could not affect the market value of their properties is also not supported. The court cannot conclude as a matter of law that plaintiffs are barred from proving that there has been a diminution in value to their properties following issuance of the NITU, on the grounds that any legal risk to their crossing rights is too speculative. Where, as here, plaintiffs' crossing rights do not have the same guaranteed legal status as they were shown to have in *Sears*, the court will follow the approach adopted in *Moore* and allow plaintiffs the opportunity to make their valuation case. Thus, the government's motion for summary judgment is also **DENIED**.

## CONCLUSION

For all of these reasons, the cross motions for summary judgment are **DENIED**. The parties shall have until **November 20, 2017** to file a joint status report setting forth a schedule for resolving the valuation issues in the case.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge